UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

ROBERT WAYNE ANNABEL II,

              Plaintiff,

                                 Case No. 1:24-cv-97

v.

                                 Hon. Hala Y. Jarbou

HEIDI E. WASHINGTON, et al.,

              Defendants.

_____/

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983 and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq*. The Court has granted Plaintiff leave to proceed *in forma pauperis* in a separate order. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I.      Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan. The events about which he complains occurred at that facility and the Macomb Correctional Facility (MRF) in New Haven, Macomb County, Michigan.  Plaintiff sues MDOC Director Heidi E. Washington, MDOC Deputy Director Jeremy Bush, ICF Warden John Davids, current MRF Warden J. Tanner, former MRF Warden George Stephenson, current MRF Assistant Deputy Warden Unknown McKinney, former MRF Assistant Deputy Warden Willis Chapman, and MRF law librarian Norbert Fronczak. Plaintiff indicates that he is suing Defendants in their official capacities for his ADA claims and in their personal capacities "for monetary damages," which the Court construes to be an assertion that Plaintiff is suing Defendants in their personal capacities for his § 1983 claims.

In his complaint, Plaintiff indicates that he "has bene marked by [D]efendants and the Michigan Department of Attorney General as a successful litigant." (Compl., ECF No. 1, PageID.3.) Plaintiff suggests that the "gist of this [c]ivil [c]omplaint is a recent, detailed conspiracy by most [D]efendants to retaliate against Plaintiff for his own lawsuits and for his offerring [sic] to testify in prisoner Joel Carter['s] civil jury trial." (*Id.*, PageID.3–4.)

Plaintiff notes that in September of 2017, he was housed in administrative segregation "at the notoriously corrupt" ICF. (*Id.*, PageID.4.) He contends that employees would often challenge him "to do stunts for their entertainment." (*Id.*) For example, Plaintiff alleges that employees "challenged him to do a comedy stunt to loudly break through the back window of his cell, on camera, even observed him in the process and covered for him in shakedowns." (*Id.*) According to Plaintiff, "[s]taff bragged and laughed at the video for 13 months until Plaintiff transferred down to a security level IV facility." (*Id.*)

Plaintiff was subsequently "prosecuted for prison escape as a 4th habitual, though all evidence showed no intent to leave the prison." (*Id.*) According to Plaintiff, at his preliminary examination, MDOC employees "admitted knowing about the planned stunt and doing nothing to stop it." (*Id.*) Plaintiff suggests that although he "could have easily beat the charge, a few days later he accepted a plea deal for only five months." (*Id.*)

Plaintiff claims that after this incident, Defendants Washington and Bush ordered that solid metal plates be welded over all windows at ICF. (*Id.*) Plaintiff claims that this caused ventilation into the cells to stop, and that it was "an excessive and exaggerated response, since a prisoner cannot possibly break through a window without staff approval." (*Id.*, PageID.4–5.) According to Plaintiff, Defendants Washington and Bush "disregarded warnings that cutting off cell window ventilation would be dangerous for mentally ill prisoners prescribed psychotropic medication and at risk of serious heat-related illness." (*Id.*, PageID.5.) Plaintiff notes that inmate Joel Carter filed a lawsuit regarding the windows, and that Plaintiff anticipated providing testimony "that it was unnecessary to completely cutoff window ventilation in order to prevent escape." (*Id.*)

Plaintiff goes on to state that since 2019, he had been housed in a Level IV population. (*Id.*) He was granted parole in 2020, but "returned to Level IV custody on May 28, 2022, on pending charges that he anticipates acquittal." (*Id.*) Plaintiff notes that since 2020, he has only been found guilty of one misconduct and "now has Level II security classification points." (*Id.*)

Plaintiff was in Level IV at MRF when he believed that he would be "discharged from [the Residential Treatment Program] to [o]utpatient security Level II." (*Id.*, PageID.6.) He alleges, however, that on January 18, 2024, Defendants Washington, Bush, and McKinney instead transferred him to a "locked-down segregation unit" on Level V at ICF. (*Id.*) Plaintiff indicates

that "[p]er MDOC policy for a two security level departure, McKinney had to obtain the approval of Director Washington and Deputy Director Bush." (*Id.*)

Plaintiff alleges that he was scheduled to testify at inmate Carter's civil jury trial at the federal courthouse in Lansing on January 22, 2024, "just four days after that extreme retaliatory transfer." (*Id.*) "Plaintiff had not received any notice that he was scheduled to testify on that date." (*Id.*) According to Plaintiff, after he was two hours late to be brought to court, the presiding judge called Defendants Washington and Bush "to demand that Plaintiff be brought to the courthouse NOW." (*Id.*) Plaintiff suggests that "Defendants had not intended to allow Plaintiff to appear and to testify, but for the federal judge investigating the delay." (*Id.*)

Plaintiff claims that when he arrived for the trial, he was "marched before the jury like Charles Manson." (*Id.*, PageID.7.) He suggests that the assistant attorney general tried to "unfairly prejudice" his testimony by "ask[ing] him about an alleged parole violation, criminal charges that he has not been convicted of, the 14 lawsuits Plaintiff . . . had filed while incarcerated, and implied that he was in Level V maximum security due to continual misconduct." (*Id.*) Plaintiff avers that, "[s]adly, prisoner Carter declined to elicit Plaintiff's testimony, [and Plaintiff] was not allowed to volunteer it or to coax Carter to request it." (*Id.*)

Plaintiff claims that the "supposed justification for the retaliatory transfer was Plaintiff's 'criminal history.'" (*Id.*) Plaintiff argues, however, that since 2019, he had been in Level V and had not been convicted of a new crime. (*Id.*) He also avers that "many prisoners with far worse criminal histories are still in Level II." (*Id.*) Plaintiff alleges that he "falls under none of the security classification's expressly listed criteria for Level V placement." (*Id.*)

Plaintiff goes on to state that the "retaliation cake comes with icing, too." (*Id.*) Plaintiff alleges that on January 3, 2024, Defendant McKinney issued Plaintiff "a retaliatory Class II

misconduct charge for allegedly filing two false grievances against Defendant Norbert Fronczak for denying Plaintiff law library callouts." (*Id.*, PageID.7–8.) Plaintiff claims, however, that "none of the law library callout dates in the misconduct report match the incident dates of January 2, 2024, and January 10, 2024, stated in Plaintiff's two grievances." (*Id.*, PageID.8.) Plaintiff notes further that "the callout dates listed in the misconduct report also reflect that Plaintiff had not received his full four hours per week of law library sessions. Two lawsuits were pending." (*Id.*)

Plaintiff alleges further that "[d]espite many substantial periods of good behavior," Defendants Washington, Bush, Davids, Stephenson, Chapman, and Tanner "have refused to waive the Loss of Privileges sanction that Plaintiff had acquired at the notoriously corrupt [ICF], since 2014, and buried with seven more years to serve." (*Id.*) Plaintiff argues that Defendants "enforce a prisoner disciplinary policy that disparately impacts mentally ill prisoners like Plaintiff, does not accommodate their disabilities with a waiver for good behavior, violates the Eighth Amendment by denying out-of-cell physical activities and recreational activities, and by denying incentives to continue to engage in good behavior." (*Id.*)

Based on the foregoing, Plaintiff contends that Defendants Washington, Bush, McKinney, and Fronczak violated his First Amendment rights by "retaliating for his filing lawsuits and grievances and offering to testify at prisoner Carter's civil trial." (*Id.*, PageID.9.) Plaintiff also alleges that all Defendants, except for Defendants McKinney and Fronczak, violated his Eighth Amendment and ADA rights "by a policy that disparately impacts mentally ill [prisoners like Plaintiff by] refusing to grant a[] loss of privileges waiver for decades of sanctions, despite several substantial periods of good behavior, and have denied reasonable accommodations." (*Id.*, PageID.9–10.) The Court also construes Plaintiff's complaint to assert Fourteenth Amendment due process claims premised upon the security classification and the issuance of an allegedly false

5

misconduct, a First Amendment access to the courts claim against Defendant Fronczak for denying Plaintiff law library time, and a civil conspiracy claim against all Defendants.

Plaintiff seeks declaratory relief and an injunction in the form of an order directing Defendants to transfer Plaintiff "to a Security Level II facility that is not known for a high rate of issuing prisoner misconduct charges or receiving written complaints by prisoners, and to also grant Plaintiff a full and complete waiver of all previously acquired loss of privileges sanctions." (*Id.*, PageID.10.) Plaintiff also seeks compensatory and punitive damages and asks that the Court "exempt any award of damages from being collected under the State of Michigan Correctional Facility Reimbursement Act." (*Id.*)

## II.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to

relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

### A.      Section 1983 Claims

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### 1.      First Amendment Claims

### a.      Retaliation

Plaintiff contends that Defendants Washington, Bush, McKinney, and Fronczak retaliated against him "for his filing lawsuits and grievances and offering to testify at prisoner Carter's civil trial." (Compl., ECF No. 1, PageID.9.) Plaintiff appears to base his retaliation claims on: (1) Defendants Washington, Bush, and McKinney's decision to transfer him to ICF; (2) Defendant McKinney's issuance of a class II misconduct; and (3) Defendant Fronczak's denial of Plaintiff's law library callout requests.

In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). Moreover, a plaintiff must be able to prove that the

7

exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

### (i)    Protected Conduct

Filing a civil rights lawsuit constitutes protected conduct. *See Bell v. Johnson*, 308 F.3d 594, 607 (6th Cir. 2002). An inmate also has a right to file non-frivolous grievances against prison officials on his own behalf. *See Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018). Although Plaintiff has not provided details regarding the nature of his lawsuits and grievances, the Court assumes without deciding that they constitute protected conduct.

Plaintiff also suggests that he engaged in protected conduct by offering to testify at prisoner Carter's civil jury trial. A prison inmate, however, "does not have an independent right to help other prisoners with their legal claims." *Thaddeus-X*, 175 F.3d at 395 (citing *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993)). "Such assistance is protected, however, when the inmate receiving the assistance would otherwise be unable to pursue legal redress." *Herron v. Harrison*, 203 F.3d 410, 415–16 (6th Cir. 2000) (citing *Thaddeus-X*, 175 F.3d at 395; *Gibbs*, 10 F.3d at 378). The protected status in this context derives from the right of access to the courts of the litigant being supported, *id.*, not the inmate providing that assistance, such as Plaintiff here.

Plaintiff has provided no facts from which the Court could infer that prisoner Carter would be unable to proceed with his suit without Plaintiff's testimony. Nor can he. Public records indicate that Plaintiff did provide testimony at prisoner Carter's jury trial. *See* Jury Trial Minutes, Day 1, *Carter v. Washington et al.*, No. 1:21-cv-331 (W.D. Mich.) (ECF No. 118). Ultimately, the jury returned a verdict in Carter's favor on his ADA and Rehabilitation Act (RA) claims and in favor of the remaining defendant on Carter's Eighth Amendment claim. *See* Jury Verdict, *id.* (ECF No. 120). The jury awarded Carter $1.00 in compensatory damages. *Id.* Given this posture, Plaintiff's

provision of testimony at prisoner Carter's civil trial does not constitute protected conduct for purposes of his First Amendment retaliation claims.

### (ii)        Adverse Action

To establish the second element of a retaliation claim, a prisoner-plaintiff must show adverse action by a prison official sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendant's conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence. *Bell*, 308 F.3d at 606.

First, Defendant McKinney's issuance of a misconduct ticket constitutes adverse action. *See Thomas v. Eby*, 481 F.3d 434, 441 (6th Cir. 2007); *see also Hill*, 630 F.3d at 474 (holding that "actions that result in more restrictions and fewer privileges for prisoners are considered adverse").

Plaintiff also alleges that Defendants Washington, Bush, and McKinney retaliated against him by transferring him from Level IV at MRF to Level V at ICF, where Plaintiff was placed in a segregation unit. Transfer to administrative segregation or another prison's lock-down unit can be sufficient to constitute adverse action. *See Hill*, 630 F.3d at 474–75.

Finally, Plaintiff alleges that Defendant Fronczak denied his law library callout requests. (Compl., ECF No. 1, PageID.8.) Plaintiff's complaint suggests that he did not receive his callouts on two occasions, and that he did not receive "his full four hours per week of law library sessions." (*Id.*) While consistent, repeated denial of access to the law library can rise to the level of adverse action, *see Lewis v. Clark*, 577 F. App'x 786, 799 (10th Cir. 2014), the Sixth Circuit has suggested that "denial of access to the law library on one occasion" is too *de minimis* to constitute adverse action, *See Meeks v. Schofield*, 625 F. App'x 697, 702 (6th Cir. 2015). Here, Plaintiff's facts do

not permit the Court to infer that he was consistently and repeatedly denied law library access. Thus, Plaintiff has not adequately alleged that Defendant Fronczak engaged in adverse action.[1]

### (iii)     Retaliatory Motive

Finally, to satisfy the third element of a retaliation claim, Plaintiff must allege facts that support an inference that the alleged adverse action was motivated by the protected conduct.

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). However, "alleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (discussing that in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial" (internal quotation marks omitted)); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("[B]are allegations of malice on the defendants' parts are not enough to establish retaliation claims [that will survive § 1915A screening]." (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998))).

Here, Plaintiff merely alleges the ultimate fact of retaliation with respect to Defendants Washington, Bush, McKinney, and Fronczak. With respect to Defendants Washington and Bush, Plaintiff's complaint is devoid of facts suggesting that they were even aware of any of Plaintiff's prior lawsuits and grievances. Likewise, with the exception of his grievances against Defendant

---

[1] While Plaintiff's retaliation claim against Defendant Fronczak is subject to dismissal on this basis alone, as discussed *infra*, Plaintiff has failed to allege facts supporting an inference that Defendant Fronczak was motivated to deny Plaintiff's law library callouts by any protected conduct.

Fronczak, Plaintiff's complaint is devoid of facts suggesting that Defendant McKinney was aware of any of his other grievances and lawsuits. Additionally, Plaintiff's complaint is devoid of facts from which the Court could infer that Defendant Fronczak was aware of Plaintiff's pending lawsuits when Plaintiff's requests for law library callouts were denied. Rather, Plaintiff appears to rely on his suggestion that these individuals retaliated against him because they have "marked" him as a "successful litigant." (Compl., ECF No. 1, PageID.3.) Plaintiff, however, does not provide any facts to support this assertion or to suggest that these individuals were aware of his litigation activity.

Moreover, while Plaintiff appears to suggest that all of the adverse action occurred at some unknown time after Plaintiff filed grievances and lawsuits, the Sixth Circuit has been reluctant to find that temporal proximity between the filing of a grievance and an official's adverse conduct, standing alone, is sufficient to establish a retaliation claim. *See Hill*, 630 F.3d at 476. This is especially true where, as here, the plaintiff is a prolific filer of grievances and lawsuits. *Coleman v. Bowerman*, 474 F. App'x 435, 437 (6th Cir. 2012) (holding that temporal proximity to the filing of a grievance is insufficient because any adverse action "would likely be in 'close temporal proximity' to one of [the plaintiff's] many grievances or grievance interviews").

In sum, for those instances where Plaintiff has alleged adverse action, Plaintiff fails to allege facts to support the inference that Defendants Washington, Bush, McKinney, and Fronczak took the adverse action because of Plaintiff's protected conduct. The Court, therefore, will dismiss Plaintiff's First Amendment retaliation claims against them.

### b.    Access to the Courts

The Court has construed Plaintiff's complaint to assert a First Amendment access to the courts claim against Defendant Fronczak premised upon Defendant Fronczak's denying Plaintiff's law library callouts on certain occasions. (Compl., ECF No. 1, PageID.8.)

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817. The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824–25. The right of access to the courts also prohibits prison officials from erecting barriers that may impede the inmate's access to the courts. *See Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992).

An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis*, 518 U.S. at 349; *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000. In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355. "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999). Moreover, the underlying action must have asserted a non-frivolous claim.

*Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (discussing that *Lewis* changed actual injury to include requirement that action be non-frivolous).

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 415.

Here, Plaintiff's complaint is devoid of facts regarding the underlying cause of action or a lost remedy. Plaintiff vaguely states that at the time his law library callout requests were denied, he had two lawsuits pending. (Compl., ECF No. 1, PageID.8.) Plaintiff, however, provides no detail regarding those pending lawsuits. Even if they were civil rights suits, Plaintiff simply alleges no facts regarding any remedy that he lost from having his law library callout requests denied on a few occasions. Accordingly, Plaintiff's First Amendment access to the courts claim against Defendant Fronczak will be dismissed.

### 2. Eighth Amendment Claims

Next, Plaintiff contends that Defendants Washington, Bush, Davids, Stephenson, Chapman, and Tanner have violated his Eighth Amendment rights "by a policy that disparately impacts mentally ill [prisoners like Plaintiff by] refusing to grant a[] loss of privileges waiver for decades of sanctions, despite several substantial periods of good behavior, and have denied reasonable accommodations." (Compl., ECF No. 9–10.) According to Plaintiff, this results in denial of "out-of-cell physical activities and recreational privileges." (*Id.*, PageID.8.) The Court also construes Plaintiff's complaint to assert an Eighth Amendment violation premised upon his placement in a "locked-down segregation unit" at ICF.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated

14

under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### a.      Placement in Segregation

The Court has construed Plaintiff's complaint to assert an Eighth Amendment claim premised upon his placement in a "locked-down segregation unit" at ICF. However, placement in segregation is a routine discomfort that is "part of the penalty that criminal offenders pay for their offenses against society." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). Although it appears that Plaintiff may have been denied certain privileges in segregation, he does not allege or show that he was being denied basic human needs and requirements. The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation. *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008). Plaintiff, therefore, cannot maintain an Eighth Amendment claim against any Defendant premised upon his placement in segregation.

### b.      Failure to Waive Loss of Privileges Sanctions

Plaintiff contends that Defendants Washington, Bush, Davids, Stephenson, Chapman, and Tanner have violated his Eighth Amendment rights "by a policy that disparately impacts mentally ill [prisoners like Plaintiff by] refusing to grant a[] loss of privileges waiver for decades of

sanctions, despite several substantial periods of good behavior, and have denied reasonable accommodations." (Compl., ECF No. 9–10.) According to Plaintiff, this results in denial of "out-of-cell physical activities and recreational privileges." (*Id.*, PageID.8.)

As an initial matter, MDOC Policy Directive 03.03.105 sets forth the privileges that "may be lost by a prisoner as a result of the loss of privileges sanction." *See* MDOC Policy Directive 03.03.105 ¶ RRR (eff. Apr. 18, 2022). Such privileges include: (1) use of the day room or other designated similar area use; (2) use of exercise facilities, such as the yard or gym; (3) group meetings, with the exception of religious worship services and group therapy; (4) out-of-cell hobbycraft activities; (5) use of the kitchen area; (6) direct access to the general library; (7) movies; (8) music practice and musical instruments; (9) leisure time activities, except those approved by the Warden or designee; (10) telephone use, except to call the Ombudsman and to return calls from an attorney upon the attorney's request; (11) visitation, but only if the misconduct occurred in connection with a visit; and (12) use of the kiosk to send electronic messages or retrieve account information. *Id.* Attach E. Notably, though, prisoners who receive sanctions "shall not be deprived of yard for more than 30 consecutive days without being provided a seven-day break during which the prisoner shall be given the opportunity for yard consistent with their status." *Id.* ¶ SSS. Yard privileges for segregation inmates, however, "are subject to restriction by written order of the Warden or Deputy Warden." *Id.*

The loss of any of these privileges, with perhaps the exception of exercise facilities, does not implicate the Eighth Amendment because they do not provide basic human needs and requirements. With respect to exercise, it is well established that "total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees." *See Rodgers v. Jabe*, 43 F.3d 1082, 1086 (6th Cir. 1995) (quoting *Patterson v.*

*Mintzes*, 717 F.2d 284, 289 (6th Cir. 1983)). Here, Plaintiff suggests that Defendants Washington, Bush, Davids, Stephenson, Chapman, and Tanner have refused to waive the loss of privileges sanctions since 2014. (Compl., ECF No. 1, PageID.8.) Plaintiff does not allege that he has been denied the "loss of privileges" respite provided by MDOC policy directive. In *Tucker v. Brown*, No. 98-1266, 1999 WL 283889 (6th Cir. Apr. 27, 1999), the Sixth Circuit concluded that long-term loss of privilege sanctions with the respite breaks afforded by the policy "ha[d] never been held to amount to a significant and atypical hardship in relation to the ordinary incident of prison life by this court." *Id*. at *3. Certainly, a sanction that is neither a significant nor an atypical hardship cannot rise to the level of an Eighth Amendment violation.

In any event, nothing in Plaintiff's complaint allows the Court to infer that Defendants Washington, Bush, Davids, Stephenson, Chapman, and Tanner have been deliberately indifferent to any serious risk of harm. Plaintiff has alleged no facts suggesting that they personally refused to waive any loss of privileges sanctions imposed upon Plaintiff. Moreover, he has not alleged any facts suggesting that these individuals personally denied him any sanction breaks or out-of-cell exercise time. Plaintiff also fails to suggest that his cell was or is too small to permit any exercise or that he suffered any ill effects from the limitation on his yard privileges, and nothing in the complaint allows the Court to infer that any of the named Defendants were personally aware of any ill effects, if there were any. Consequently, the Court will dismiss Plaintiff's Eighth Amendment claims against Defendants Washington, Bush, Davids, Stephenson, Chapman, and Tanner.

### 3. Fourteenth Amendment Claims

#### a. Due Process—Security Classification and Placement in Segregation

The Court has construed Plaintiff's complaint to assert Fourteenth Amendment due process claims against Defendants Washington, Bush, and McKinney premised upon Plaintiff's transfer from Level IV at MRF to Level V at ICF. (Compl., ECF No. 1, PageID.6.) Plaintiff contends that the transfer resulted in his placement in a "locked-down segregation unit." (*Id.*)

In order to prevail on a procedural due process claim, an inmate must first demonstrate that he was deprived of "life, liberty, or property" by government action. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). Prisoners retain a liberty interest with respect to state-imposed prison discipline that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

Here, Plaintiff fails to state a violation of his due process rights. Plaintiff does not have a protected liberty interest in the procedures affecting his classification and security because the resulting restraint does not impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 486. Moreover, the Supreme Court has repeatedly held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification. *See Olim*, 461 U.S. at 245; *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum*, 427 U.S. at 244. Relying on *Sandin*, the Sixth Circuit has held that a Michigan prisoner can no longer claim a liberty interest in his security classification. *See Harbin-Bey*, 420 F.3d at 577; *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995); *accord Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997). Plaintiff's designation to Level V is nothing more than a

security classification used by the prison. *Harbin-Bey*, 420 F.3d at 577. Because Plaintiff does not have a constitutional right to a particular security level or classification, he fails to state a due process claim.

Moreover, Plaintiff has not alleged—and he cannot—that his placement in a segregation unit at ICF has violated his due process rights. With respect to a prisoner's detention in segregation, generally only periods of segregation lasting for a year or more have been found to be atypical and significant. *See, e.g.*, *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (concluding that thirteen years of segregation implicates a liberty interest); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) (finding that eight years of segregation implicates a liberty interest); *Harden-Bey*, 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, i.e., three years without an explanation from prison officials, implicates a liberty interest). Here, Plaintiff alleges that he was transferred to the segregation unit at ICF on January 18, 2024. (Compl., ECF No. 1, PageID.6.) Plaintiff, therefore, has been in segregation for only about two months, which does not rise to the level of an atypical and significant hardship.

Accordingly, for the reasons set forth above, any Fourteenth Amendment due process claims against Defendants Washington, Bush, and McKinney premised upon Plaintiff's security level increase and placement in segregation will be dismissed.

### b.     Due Process—False Misconduct

The Court has also construed Plaintiff's complaint to assert a Fourteenth Amendment procedural due process claim against Defendant McKinney premised upon his issuance of an allegedly false class II misconduct to Plaintiff. (Compl., ECF No. 1, PageID.7.)

A prisoner's ability to challenge a prison misconduct conviction depends on whether the conviction implicated any liberty interest. A prisoner does not have a protected liberty interest in

prison disciplinary proceedings unless the sanction "will inevitably affect the duration of his sentence" or the resulting restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin*, 515 U.S. at 484, 487. Under MDOC Policy Directive 03.03.105, ¶ C, a class I misconduct is a "major" misconduct and class II and III misconducts are "minor" misconducts. The policy further provides that prisoners are deprived of good time or disciplinary credits only when they are found guilty of a class I misconduct. *Id*. ¶ DDDD.

Plaintiff does not indicate whether he was even found guilty of this misconduct. In any event, with respect to the class II misconduct, the Sixth Circuit has routinely held that misconduct convictions that do not result in the loss of good time are not atypical and significant deprivations and therefore do not implicate due process. *See, e.g.*, *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004), *overruled on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003); *Green v. Waldren*, No. 99-1561, 2000 WL 876765, at *2 (6th Cir. June 23, 2000); *Staffney v. Allen*, No. 98-1880, 1999 WL 617967, at *2 (6th Cir. Aug. 12, 1999). Accordingly, any intended Fourteenth Amendment due process claim against Defendant McKinney premised upon the issuance of the misconduct will be dismissed.[2]

---

[2] To the extent Plaintiff intended to raise a substantive due process claim regarding the alleged false misconduct, he fails to state such a claim. "Substantive due process 'prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). "Substantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)). "Conduct shocks the conscience if it 'violates the decencies of civilized conduct.'" *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)). With respect to an allegedly falsified misconduct report, the Sixth Circuit has held that framing an inmate by planting evidence may violate substantive due process where a defendants conduct shocks the conscience and constitutes an "egregious abuse of governmental

4.      **Civil Conspiracy Claims**

The Court has also construed Plaintiff's complaint to assert civil conspiracy claims against Defendants, given that he describes the "gist" of his complaint to be a "recent, detailed conspiracy by most Defendants to retaliate against Plaintiff." (Compl., ECF No. 1, PageID.3.)

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Id.*; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff provides no allegations regarding any agreement among any of these individuals, other than the fact that they are employed at ICF or MRF and are all employed by the MDOC. Plaintiff's allegations of conspiracy are wholly conclusory. He alleges no *facts* that indicate the existence of a plan, much less that any Defendant shared a conspiratorial objective. As the Supreme

_____

power." *Cale v. Johnson*, 861 F.2d 943, 950 (6th Cir. 1988), *overruled in other part by Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999). Plaintiff's complaint, however, is devoid of any allegations from which the Court could infer that Defendant McKinney acted to frame Plaintiff. Moreover, Plaintiff's allegations fall short of demonstrating the sort of egregious conduct that would support a substantive due process claim.

21

Court has held, such allegations, while hinting at a "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Instead, the Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 567). That is certainly the case here. Accordingly, Plaintiff's conspiracy claims under § 1983 will be dismissed.[3]

### B.    ADA Claims

Plaintiff also alleges that Defendants Washington, Bush, Davids, Stephenson, Chapman, and Tanner violated his rights under the ADA "by a policy that disparately impacts mentally ill [prisoners like Plaintiff by] refusing to grant a[] loss of privileges waiver for decades of sanctions, despite several substantial periods of good behavior, and have denied reasonable accommodations." (*Id.*, PageID.9–10.)

---

[3] Plaintiff's conspiracy claims also would be barred by the intracorporate conspiracy doctrine. The intracorporate conspiracy doctrine states that "if all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Ed.*, 926 F.2d 505, 510 (6th Cir. 1991). Initially applied to claims under 42 U.S.C. § 1985(3), *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839–40 (6th Cir. 1994) (quoting *Hull*, 926 F.2d at 510), the Sixth Circuit has concluded that the intracorporate conspiracy doctrine applies to claims under § 1983 as well, *Jackson v. City of Cleveland*, 925 F.3d 793, 817–19 (6th Cir. 2019). As a result, unless members of the same collective entity (such as the MDOC) are acting outside the scope of their employment, they are deemed to be one collective entity and not capable of conspiring. *Id.* at 819; *see also Novak v. City of Parma*, 932 F.3d 421, 436–37 (6th Cir. 2019) (same). Here, Defendants are members of the same collective entity—the MDOC. Plaintiff does not even allege, much less show, that Defendants were acting outside the scope of their employment. To bring claims outside of the intracorporate conspiracy doctrine, a plaintiff must allege that the defendants "acted other than in the normal course of their corporate duties." *Johnson*, 40 F.3d at 840. Plaintiff's complaint is devoid of facts suggesting that Defendants were acting outside the normal course of their duties, however improperly he believes they may have been exercising those duties.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In the ADA, the term "disability" is defined as follows: "[1] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [2] a record of such an impairment; or [3] being regarded as having such an impairment." *Id.* § 12102(2).

The Supreme Court has held that Title II of the ADA applies to state prisons and inmates. *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210–12 (1998). The proper defendant for Title II ADA claims is the public entity or an official acting in his official capacity. *Carten v. Kent State Univ.*, 282 F.3d 391, 396–97 (6th Cir. 2002). Here, Plaintiff explicitly states that he is suing all Defendants in their official capacities for purposes of his ADA claims. (Compl., ECF No. 1, PageID.3.)

Plaintiff, however, has not stated a plausible ADA claim against any of the named Defendants. Plaintiff alleges only that the Defendants named above "enforce a prisoner disciplinary policy that disparately impacts mentally ill prisoners like Plaintiff [and] does not accommodate their disabilities with a waiver for good behavior." (Compl., ECF No. 1, PageID.8.) Plaintiff does not contend that Defendants discriminate against him and other mentally ill prisoners because of their disabilities, as is required for an ADA claim. *See* 42 U.S.C. § 12132. Instead, Plaintiff's complaint suggests that all inmates can be potentially subject to lengthy loss of privileges sanctions, but that such sanctions may have more of an impact upon a mentally ill inmate. Thus, the lack of allegations suggesting that Defendants treated Plaintiff differently because of his mental illness mandates dismissal of his ADA claims. *See Barhite v. Brown*, No.

23

1:14-cv-218, 2014 WL 2918550, at *11–25 (W.D. Mich. June 26, 2014) (dismissing ADA claims against several defendants because the plaintiff had not alleged facts suggesting that they treated him differently on account of his disability).

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $605.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $605.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.

Dated: March 13, 2024

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE